1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARVIN BRYANT,

      Petitioner,

  v.

T. FELKER, Warden,

      Respondent.
_____/

No. C 06-0005 CW (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

    Petitioner Marvin Bryant is a prisoner of the State of California, incarcerated at CSP-Solano.  On May 29, 2007, Petitioner filed pro se a second amended petition[1] for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his 2002 state convictions.  Respondent filed an answer and Petitioner filed a traverse.  Having considered all of the papers filed by the parties, the Court DENIES the petition for writ of habeas corpus.

BACKGROUND

I.  Procedural History

    In 2002, Petitioner waived his right to a jury trial and was convicted of attempted murder, residential robbery, assault with a

_____

    [1] On January 3, 2006, Petitioner filed an original petition for writ of habeas corpus.  On March 15, 2007, the Court stayed the petition in order to allow Petitioner to exhaust his claims.  On April 23, 2007, Petitioner filed an amended petition and on May 29, 2007, Petitioner filed a second amended petition.  On June 30, 2009, the Court lifted the stay, granted Petitioner leave to file the second amended petition, and directed Respondent to file a response showing cause why Petitioner's second amended petition should not be granted.

firearm, and residential burglary. (Resp. Memo. at 1.) On May 2, 2003, the trial court sentenced Petitioner to twenty-eight years. (Second Amended Petition (SAP) at 2.) The trial court found true the allegations of personal use of a firearm, intentional discharge of a firearm, and infliction of great bodily injury.

Petitioner timely appealed to the California Court of Appeal. On September 20, 2004, the California Court of Appeal filed a written opinion rejecting Petitioner's claims. (Resp. Ex. 9.) Petitioner proceeded to the California Supreme Court, which denied his petition in a one sentence order on December 1, 2004. (Resp. Ex. 11.) Petitioner filed unsuccessful state habeas petitions in the California Court of Appeal and California Supreme Court. (Resp. Exs. 12, 14, 16, 19-21.) Thereafter, Petitioner filed the underlying second amended petition.

II. Statement of Facts

The California Court of Appeal described the facts as follows:

In the spring of 2001 Denise Turner lived in the same Concord apartment complex as Pamela and Raman Khanna, and Turner sold Pamela Vicodin pills on a weekly basis. Sometimes Pamela paid for the Vicodin with $100 bills that she got from Raman. Raman kept $100 bills in a lockbox located in the Khannas's bedroom closet.

On May 7, 2001, Pamela hung up the telephone on Turner when Turner called asking for $40 that she claimed Pamela owed her for Vicodin. Minutes later Turner showed up at the Khannas's apartment and argued with Pamela, who asked her to leave. Raman gave Turner $40 and as she left, Pamela called her a "fucking black bitch."

Less than 10 minutes later, when Raman answered a knock at the door he saw two African American men on the landing outside his door, and a third African American man on the stairway. At trial Raman identified the 18-year-old defendant as one of the men on the landing. The other man on the landing, Turner's brother Nathan Westbrook, said to Raman, "You called my sister a black bitch," and Pamela said, "No, I did." After Westbrook threatened to break the door down, Raman went out

2

and apologized for the "misunderstanding" between Turner and Pamela. As the three men walked away, defendant said, "You're looking to get knocked off."

At approximately 2:30 a.m. on May 9, 2001, Pamela woke up Raman after hearing someone trying to break in the front door. Through the kitchen window Raman saw appellant prying the lock on the door. After several minutes, Raman unsuccessfully looked out the door's peephole, the door swung open hitting Raman, and he fell to the floor. Defendant entered, demanded Raman's money, asked where the "hundreds" and Raman's wife were. Defendant then shot Raman in the shoulder, grabbed his hair, and slashed his throat with a knife. Defendant then demanded that Raman crawl to the bedroom where he looked through drawers and the closet in which Pamela was hiding. About 10 minutes later, defendant left the apartment with Raman's lockbox and key, wallet and cell phone. Pamela called 911.

While being transported to the hospital Raman told police about the argument between Turner and Pamela, that three men had come to the door and he was not sure he could identify his attacker. He did say his attacker wore black clothing and a black beanie. At about 7:00 a.m. following surgery, Raman gave a taped interview with police and described his attacker as the youngest of the three men who had come to his door. Two days later, while still in the hospital, Raman was shown a photo lineup and pointed to photo number 6, which was not defendant's photo, and said, "this guy looks the most like him."

Thereafter defendant was interviewed by police and police obtained a current photograph of him to construct a new photo lineup. Several days later, after being discharged from the hospital, Raman identified defendant as his attacker in a second photo lineup which contained defendant's current photo. In the second photo, defendant was much lighter and in a different position than the photo of him which was included in the earlier photo lineup shown to Raman. The second photo lineup also contained five filler photos which were different from the five filler photos included in the earlier photo lineup. Raman identified defendant as his attacker from this second photo lineup and again at the preliminary hearing. A neighbor of the Khannas's told police that after hearing a "pop" he saw a Black man run from the stairwell leading to his and the Khannas's apartment. In August 2002 he picked defendant's picture from a photo lineup, said he recognized him from the night of the offense and that he looked familiar.

An investigation of the crime scene revealed that the screen to the Khannas's kitchen window had been removed, pry marks were on the screen and door frames and the peephole had been taped. Defendant's fingerprints were found on the exterior kitchen window. The knife which Raman said looked like the

one that had slashed him was recovered from a planter box on the other side of the apartment complex. Defendant, who lived at the apartment complex, was briefly detained by police about 30 minutes after the incident and about 200 yards from the Khannas's apartment. Defendant was released because his clothing did not match the dispatch description of Raman's attacker.

Testifying on his own behalf, defendant admitted: vandalizing a car at age 14, an auto theft conviction at age 16, a 1997 arrest for possessing a "Ninja-rock," used to break car windows, a 1998 arrest for stealing a video game, and a 1999 allegation of domestic violence by his girlfriend. Defendant said he was at Turner's apartment when she came home upset that Pamela had called her a "black bitch." He admitted he went with Westbrook and two other men to Pamela's apartment to demand an apology. He said Westbrook, Raman and Pamela argued outside the Khannas's apartment. Defendant denied saying anything or threatening the Khannas. He also denied returning to the Khannas's apartment and having any involvement in the crimes committed.

(Resp. Ex. 9 at 2-4.)

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, id. at

4

407-09, and the second prong applies to decisions based on factual

determinations, <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." <u>Id.</u> at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. <u>Id.</u> at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." <u>Miller-El</u>, 537 U.S. at 340. A petitioner must present clear and convincing evidence to overcome the presumption of correctness under § 2254(e)(1); conclusory assertions will not do. <u>Id.</u> Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

whether a state court decision is objectively unreasonable.  Clark
v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

If constitutional error is found, habeas relief is warranted
only if the error had a "'substantial and injurious effect or
influence in determining the jury's verdict.'"  Penry v. Johnson,
532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S.
619, 638 (1993)).

When there is no reasoned opinion from the highest state court
to consider the petitioner's claims, the court looks to the last
reasoned opinion of the highest court to analyze whether the state
judgment was erroneous under the standard of § 2254(d).  Ylst v.
Nunnemaker, 501 U.S. 797, 801-06 (1991).  However, the standard of
review under AEDPA is somewhat different where the state court
gives no reasoned explanation of its decision on a petitioner's
federal claim and there is no reasoned lower court decision on the
claim.  In such a case, a review of the record is the only means of
deciding whether the state court's decision was objectively
reasonable.  See Plascencia v. Alameida, 467 F.3d 1190, 1197-98
(9th Cir. 2006); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.
2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002).
When confronted with such a decision, a federal court should
conduct "an independent review of the record" to determine whether
the state court's decision was an objectively unreasonable
application of clearly established federal law.  Plascencia, 467
F.3d at 1198; accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16
(9th Cir. 2004).  The federal court need not otherwise defer to the
state court decision under AEDPA:  "A state court's decision on the

merits concerning a question of law is, and should be, afforded respect.  If there is no such decision on the merits, however, there is nothing to which to defer."  <u>Greene</u>, 288 F.3d at 1089.

DISCUSSION

Petitioner raises four claims in his federal habeas petition. First, he alleges that the pre-trial photo identification procedure was unduly suggestive and tainted Raman's in-court identification. Second, Petitioner asserts that counsel was ineffective for failing to file a motion to exclude the pre-trial identification.  Third, Petitioner alleges that the prosecutor committed misconduct by allowing Raman to commit perjury.  Finally, Petitioner claims that his sentence violates <u>United States v. Booker</u>, 543 U.S. 220 (2005).

I.   Suggestive identification procedure

In the first photo line-up, Raman pointed at Number 6 as the person who looked "most like" the assailant.  Petitioner was not the person depicted in Number 6.  Six days after the attack, Raman was shown another photo line-up, with a different, more recent photo of Petitioner, and without photograph No. 6 from the first line-up.  Raman pointed at the Petitioner's photo and indicated that he was the assailant.  Petitioner claims that the pre-trial photo identification procedure was unduly suggestive.  Petitioner claims that because he was the only person to have appeared in both photo line-ups, Raman was more likely to choose him.  Petitioner also asserts that the failure to include the Number 6 photo from the first line-up in the second line-up must have led Raman to believe that the person he thought might be the suspect, in fact, was not and therefore, he had to choose someone else.  Thus,

United States District Court
For the Northern District of California

alleges Petitioner, the identification procedure was unnecessarily suggestive.

The California Supreme Court summarily denied this claim.

Procedures by which a defendant is identified as the perpetrator must be examined to assess whether they are unduly suggestive.  "It is the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 U.S. 188, 198 (1972).  An identification procedure is impermissibly suggestive when it emphasizes a single individual, thereby increasing the likelihood of misidentification.  Foster v. California, 394 U.S. 440, 443 (1969); United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985).

Petitioner's photo in the first line-up, placed in position Number 3, had been taken two years prior at a DMV office.  (RT 494-495.)  The officer who assembled the photo line-up had the picture enhanced to improve exposure.  (Id.)  Petitioner's photo in the second line-up, placed in position Number 4, had been taken three days after the underlying crimes.  (RT at 498-499; Ex. 8.)

The photo line-ups were not impermissibly suggestive. Analyzing the photo line-ups separately, a comparison of the photos in the first line-up does not reveal any significant differences between the men displayed in the spread.  (Resp. Ex. 7.)  All of the men were African-American and mostly clean-shaven[2] with similar short hair styles.  (Id.)  In addition, with the exception of Number 6, the one that Raman believed looked most like the

---

[2]   Raman indicated that he was not sure whether his assailant had facial hair.  (RT 221, 233-235.)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

assailant, all of the men were photographed against a blue
background.  The first photo line-up does not single out Petitioner
from the others.

A comparison of the photos in the second line-up also does not
reveal any significant differences among them.  (Resp. Ex. 8.)
Again, all the men were African-American and mostly clean-shaven
with similar short hair styles.  (Id.)  The men were also all
photographed against a light background.  (Id.)  There is no
particular emphasis on Petitioner in the second line-up that would
have singled him out from the others.

In addition, the omission of photo Number 6 from the second
line-up, combined with Petitioner being the only common individual
in both line-ups, did not emphasize the focus upon a single
individual.  Here, Officer Murray, the officer who presented both
photographic line-ups to Raman, testified that prior to showing
Raman each photo array, he gave the standard admonition to him,
advising him that he was under no obligation to select any
individual and that the purpose of the line-up was not only to find
the attacker, but also to eliminate those who were innocent of the
crime.  (RT 154, 498, 500.)  At no time did Murray emphasize any
individual when showing Raman the photo arrays.  (RT 189.)
Although Raman had pointed to the Number 6 photo in the first line-
up as the man who looked "most like" his assailant, both Raman and
Murray testified that Raman actually did not identify anyone in the
first photo line-up as his attacker.  (RT 155, 496, 532-33.)  In
fact, with respect to the first photo line-up, Raman referred to
every picture except Petitioner's, and remarked that "the people

looked familiar." (RT 496-98; 532-33.)  In contrast, a few days later, when the officer presented Raman with the second photo line-up, which included the more recent photo of Petitioner, Raman quickly pointed to Petitioner's photograph and stated, "Right there." (RT 501.)  Thus, the record belies Petitioner's assertion that omitting the Number 6 photo from the second photo line-up implicitly told Raman that his "initial choice" was wrong because, although Raman stated Number 6 looked the most like his attacker, he actually did not identify anyone from the first photo array as his attacker.

The fact that Petitioner was the only person to have appeared in both photo line-ups is also not unduly suggestive.  See United States v. Davenport, 753 F.2d 1460, 1463 (9th Cir. 1985) (rejecting a claim of suggestive pretrial identification based only on the fact that appellant was "the only individual common to the photo spread and the lineup").  While this practice can arguably be suggestive in certain instances, it does not per se invalidate the procedure.  Moreover, in this case, Murray used a different photograph of the Petitioner in each line-up and placed it in a different location in the arrays.  This is not a situation in which Raman was repeatedly shown a photograph of Petitioner, or in which the police specifically emphasized Petitioner in some way.  See Simmons v. United States, 390 U.S. 377, 383-84 (1968).

Thus, Petitioner has failed to demonstrate that the identification procedures used in the case were "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." Johnson v. Sublett, 63

10

F.3d 926, 929 (1995) (internal quotation marks and citation omitted) (finding no due process violation where any possible prejudice defendant may suffer from unreliable identification mitigated by cross-examination and other courtroom safeguards).

However, even if the pretrial identification procedure was unduly suggestive, the in-court identification need not necessarily be excluded as tainted.    In order to determine whether an identification procedure is so unduly suggestive so as to give rise to a substantial likelihood of misidentification, the Court must examine the totality of the circumstances.  See Bagley, 772 F.2d at 492 (citing Simmons, 390 U.S. at 384).  Reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 100-14 (1977).

In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the perpetrator at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification.  Manson, 432 U.S. at 114; Neil, 409 U.S. at 199-200.  See, e.g., United States v. Drake, 543 F.3d 1080, 1089 (9th Cir. 2008) (finding that where first four factors weighed in favor of reliability, four-day delay between robbery and photo spread identification did not call identification's accuracy into question); United States v. Wang, 49 F.3d 502, 505 (9th Cir. 1995) (identification of defendant in photographs reliable where witness

had ample opportunity to view defendant and actually spoke with him).

In order to analyze the in-court identification under the factors set out in Manson and Neil, the specific circumstances of Raman's opportunity to view the assailant on the night of the crimes must be considered. At the time of the robbery, Raman saw Petitioner from his window trying to pry open Raman's front door. (RT 130-131.) Raman observed Petitioner's face for about two or three minutes. (Id.) Once the Petitioner came into the house, Raman had an opportunity to observe his face for another few minutes before Petitioner shot him and slashed his throat, and again when Raman gave Petitioner a key to a lockbox. (RT 133-135, 138, 147-148.) The first two factors weigh in favor of the reliability of the identification. Even though Raman was likely fearful and distracted once Petitioner entered the house, Raman did watch Petitioner for several minutes prior to that time trying to pry open the front door. In his interview with the police, Raman described his attacker as an African-American male, about 5'9" or 5'10", 160 pounds, and approximately 20 years old. (RT 167.) The third factor also weighs in favor of reliability, especially considering that Raman recognized Petitioner from the May 7 incident. (RT 151, 216.) In addition, when Raman selected Petitioner from the second photo line-up, he did not hesitate and was certain that Petitioner was the assailant. (RT 501.) Finally, that Raman was shown this second photo line-up only six days after the attack supports the reliability of the identification. See Neil, 409 U.S. at 201.

12

United States District Court
For the Northern District of California

1    In sum, the state court decisions were not unreasonable: the

2  identification was reliable and, even assuming that the photo

3  identification procedure was suggestive, its admission and the in-

4  court identification did not violate due process.

5  II.  Ineffective Assistance of Counsel

6    Petitioner claims that counsel rendered ineffective assistance

7  by failing to move to exclude Raman's pretrial or in-court

8  identification of Petitioner as being a result of an impermissibly

9  suggestive identification procedure.

10    The California Supreme Court denied this claim without

11  comment.

12    A claim of ineffective assistance of counsel is cognizable as

13  a claim of denial of the Sixth Amendment right to counsel, which

14  guarantees not only assistance, but effective assistance of

15  counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The

16  benchmark for judging any claim of ineffectiveness must be whether

17  counsel's conduct so undermined the proper functioning of the

18  adversarial process that the trial cannot be relied upon as having

19  produced a just result.  Id.  In order to prevail on a Sixth

20  Amendment ineffectiveness of counsel claim, a petitioner must

21  establish two things.  First, he must establish that counsel's

22  performance was deficient, i.e., that it fell below an "objective

23  standard of reasonableness" under prevailing professional norms.

24  Strickland, 466 U.S. at 687-88.  Judicial scrutiny of counsel's

25  performance must be highly deferential, and a court must indulge a

26  strong presumption that counsel's conduct falls within the wide

27

28

13

United States District Court
For the Northern District of California

range of reasonable professional assistance.  See Strickland, 466
U.S. at 689.

Second, a petitioner must establish that he was prejudiced by
counsel's deficient performance, i.e., that "there is a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different."  Id. at 694.
A reasonable probability is a probability sufficient to undermine
confidence in the outcome.  Id.  In federal habeas cases, a "doubly
deferential judicial review" is appropriate in analyzing
ineffective assistance of counsel claims.  Cheney v. Washington,
614 F.3d 987, 994-95 (9th Cir. 2010) (citing Yarborough v.
Alvarado, 541 U.S. 652, 664 (2004)).

Notwithstanding the declaration from Petitioner's appellate
counsel that trial counsel admitted there was no tactical reason
for him not to raise a suppression motion (Traverse, Ex. C), the
state courts were not unreasonable in determining that counsel was
not ineffective.  As discussed above, it was not unreasonable to
find that the pretrial identification procedure was not unduly
suggestive.  Moreover, the circumstances weigh in favor of a
reliable identification.  See Manson v. Brathwaite, 432 U.S. 98,
100-14 (1977).  Accordingly, Petitioner has not demonstrated a
reasonable probability that the result of the proceeding would have
been different had counsel challenged the pretrial identification
procedure.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999)
(to show prejudice under Strickland from failure to file a motion,
petitioner must show that (1) had his counsel filed the motion, it
is reasonable that the trial court would have granted it as

14

United States District Court
For the Northern District of California

meritorious, and (2) had the motion been granted, it is reasonable

that there would have been an outcome more favorable to him).

III. Prosecutorial misconduct

Petitioner claims that the prosecutor committed misconduct

when he allowed Raman to testify falsely that before the attack,

there was a screen on the kitchen window that was not there after

the attack.  Petitioner argues that Raman had stated previously

that on May 7 when the three men confronted Raman and his wife,

Raman had said, "When the guys were leaning through my kitchen

window . . ." which indicated that there was no screen present at

least two days before the attack.

The California Supreme Court denied this claim without

comment.

"[A] conviction obtained by the knowing use of perjured

testimony is fundamentally unfair, and must be set aside if there

is any reasonable likelihood that the false testimony could have

affected the judgment of the jury." United States v. Agurs, 427

U.S. 97, 103 (1976).  Even a conviction based in part on perjured

testimony or false evidence, presented in good faith, does not

comport with notions of fundamental fairness guaranteed by the due

process clause.  See Hayes v. Brown, 399 F.3d 972, 980 (9th Cir.

2005).  Thus, when the government unwittingly presents perjured

testimony, a reviewing court must determine whether "'there is a

reasonable probability that [without all the perjury] the result of

the proceeding would have been different.'" Killian v. Poole, 282

F.3d 1204, 1209 (9th Cir. 2002).  Ultimately, relief will depend on

whether, with the perjured testimony or false evidence, the

15

**United States District Court**
For the Northern District of California

petitioner received a fair trial.  See <u>Kyles v. Whitley</u>, 514 U.S.
419, 434 (1995).  A violation will be found, and relief will be
granted, upon a showing that the perjured testimony or false
evidence could reasonably be taken to put the whole case in such a
different light as to undermine confidence in the verdict.  See <u>id.</u>
at 435.

Even if Raman's testimony was inconsistent, this does not mean
that one of his statements was false.  "Mere inconsistencies in
testimony by government witnesses do not establish knowing use of
false testimony."  <u>Coe v. Bell</u>, 161 F.3d 320, 343 (6th Cir. 1998);
<u>see United States v. Croft</u>, 124 F.3d 1109, 1119-1120 (9th Cir.
1997) ("The fact that a witness may have made an earlier
inconsistent statement, or that other witnesses have conflicting
recollections of events, does not establish that the testimony
offered at trial was false."); <u>United States v. Zuno-Arce</u>, 44 F.3d
1420, 1423 (9th Cir. 1995) (no evidence of prosecutorial misconduct
where discrepancies in testimony could as easily flow from errors
in recollection as from lies).

Moreover, even if the trial testimony were false, it is not
probable that, without it, the result of the trial would have been
different.  Detective Finney testified that on the day of the
attack, he investigated the crime scene and noticed that although
there was a frame within the kitchen window, the frame was bent and
there were pry marks on the corner, but no screen inside the frame.
(RT 272.)  The prosecution's fingerprint expert matched three
latent prints from the kitchen window with Petitioner's prints.
Finney also testified that he found a portion of screen fabric on

16

United States District Court
For the Northern District of California

the stairway leading up to Raman's apartment (RT 274), but never located the entire screen (RT 288).  This leads to the inference that someone tried to pry open the window and removed the screen around the time of the attack.  On the other hand, Petitioner testified that he could have left his fingerprints accidentally on the window on May 7 rather than on May 9.  (RT 822.)  In addition, Petitioner's version of events included Raman's wife sticking her head out of the kitchen window on May 7 to confront Denise (RT 818-21), which would indicate that there was no screen on the window on that date, contrary to Raman's trial testimony.  These credibility determinations were properly weighed and determined by the trier of fact and may not be re-weighed in this Court.  Moreover, the issue in this case was one of identification, and whether the screen was present at the time of the attack was not material to the ultimate determination of Petitioner's guilt.

Therefore, because Petitioner fails to prove that the statements were false, or that the testimony was material, his prosecutorial misconduct claim fails under the <u>Agurs</u>/<u>Napue</u> standard.  <u>See</u> <u>Allen v. Woodford</u>, 395 F.3d 979, 995 (9th Cir. 2005) (rejecting claim of prosecutorial misconduct where witness' inconsistencies were pointed out to the jury and witness was subjected to impeachment evidence and concluding that appellant failed to establish falsity of testimony).  Accordingly, the state courts' decision denying relief on this claim was not contrary to or an unreasonable application of clearly established federal law.

17

IV.   <u>Booker</u> claim

     Petitioner argues that, because <u>United States v. Booker</u>, 543
U.S. 220 (2005), held that the mandatory application of the United
States Sentencing Guidelines was unconstitutional, the trial court
was not required to impose a twenty year mandatory gun enhancement
pursuant to California Penal Code § 12022.53(c).

     Because Petitioner was not sentenced under the United States
Sentencing Guidelines, this argument is meritless.   To the extent
Petitioner is arguing that his twenty year gun enhancement violates
the Sixth Amendment because it was not submitted to a jury, his
argument still fails.   Petitioner opted to be tried by the court
and waived his right to a jury trial.   Thus, the gun enhancement
was found true by the trier of fact.   <u>See</u> <u>Wright v. Craven</u>, 412
F.2d 915, 918-919 (9th Cir. 1969); <u>Swanson v. Adams</u>, 2007 WL
3119553, *6 (N.D. Cal.) ("Although there is little recent law and
none directly on point, it was reasonable for the court of appeal
to hold that when petitioner waived his right to a jury trial, he
waived his right to a jury determination of all issues in the case,
including those that formed the basis of the trial court's
sentencing decision.").

                              CONCLUSION

      For the foregoing reasons, the petition for a writ of habeas
corpus is denied.

     Rule 11(a) of the Rules Governing Section 2254 Cases now
requires a district court to rule on whether a petitioner is
entitled to a certificate of appealability in the same order in
which the petition is denied.   Reasonable jurists could find the

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

Court's assessment of the following claims debatable: (1) the pre-trial photo identification procedure was unduly suggestive and tainted Raman's in-court identification, and (2) counsel was ineffective for failing to file a motion to exclude the pre-trial identification.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Thus, a certificate of appealability is GRANTED as to those two claims and denied as to the others.

The clerk shall enter judgment and close the file.  All pending motions are terminated.  Each party shall bear his own costs.

IT IS SO ORDERED.


Dated: 1/24/2011

CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE

19

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

MARVIN BRYANT III,

        Plaintiff,

  v.

T.FELKER et al,

        Defendant.

_____/

Case Number: CV06-00005 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on January 24, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Marvin  Bryant T-92379
3-114U
CSP-Solano
P.O. Box 4000
Vacaville,  CA 95696-4000

Dated: January 24, 2011

Richard W. Wieking, Clerk
By: Nikki Riley, Deputy Clerk

**United States District Court**
For the Northern District of California